# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5222-15T2
                  A-5223-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

     Plaintiff-Respondent,

v.

G.S. and K.S.,

     Defendants-Appellants.
_____

IN THE MATTER OF
A.S. and B.S., Minors.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **November 22, 2016** |
| **APPELLATE DIVISION** |

Argued October 31, 2016 — Decided  November 22, 2016

Before Judges Sabatino, Haas and Currier.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-172-15.

T. Gary Mitchell, Deputy Public Defender, argued the cause for appellants (Joseph E. Krakora, Public Defender, attorney; Mr. Mitchell, of counsel and on the briefs).

Deirdre A. Carver, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Carver, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minors A.S. and

B.S. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Joseph F. Suozzo, Deputy Public Defender, of counsel; Ms. Fratz, on the brief).

Theodore T. Reilly argued the cause for amicus curiae New Jersey State Bar Association (New Jersey State Bar Association, attorneys; Thomas H. Prol, of counsel; Christopher J. Carey, Mr. Reilly and Dina M. Mikulka, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

On leave granted, we review the Family Part's series of orders that concern the potential need to disqualify one or both staff attorneys from the Office of Parental Representation ("the OPR") who respectively represent the father and the mother in defending this child welfare case. The pertinent conflict-of-interest questions now before us were prompted by co-defendants' advocacy of competing parenting plans for the future care of their twin children.

The issues presented are of first impression. In particular, we examine under the applicable Rules of Professional Responsibility ("RPCs") and case law: (1) whether an actual or potential conflict of interest arises when staff attorneys from the same OPR regional office each represent a parent having interests or positions divergent from that of the other parent; (2) any such conflicts may be waived by the clients, and, if so,

2

in what manner; and (3) what is the appropriate role of the court in dealing with such representational issues when they surface.

For the reasons that follow, we affirm, with some modification, the trial judge's determination to conduct a hearing to explore the conflict and waiver issues that arose in this particular case.

We agree with the OPR, the Office of Law Guardian ("the OLG" or "the Law Guardian"), and the amicus New Jersey State Bar Association that, with appropriate screening measures, the law does not categorically prohibit or even presumptively disfavor staff attorneys working out of the same OPR regional office from separately defending individual parents in a <u>Title</u> Nine or <u>Title</u> Thirty case. In addition, when a significant divergence arises between the parents during the course of such litigation, the actual or potential conflict often may be mutually waivable by those clients, with appropriate consultation with counsel and substantiation of that waiver.

We also conclude that the trial court has a proper institutional role in assuring that the zealous independence of the staff attorneys will not be compromised, and that the confidentiality of client communications and attorney work product will be scrupulously maintained. The court retains the authority and discretion to conduct a hearing to explore such matters on a

3

case-by-case basis to address specific instances where particularized concerns have arisen about the propriety of ongoing representation by the staff attorneys or the sufficiency of any client waivers and screening measures.

Lastly, we recommend that the representational issues presented here be prospectively examined in a broader context by the Family Practice Committee or some other designated Supreme Court Committee. Such review may include the potential drafting of a provision in Part V of the Rules of Court to address these circumstances. If adopted, those new rules might replicate some, if not all, of the facets applicable to dual representation by staff attorney public defenders in criminal cases under the principles expressed in State v. Bell, 90 N.J. 163 (1982) and the possibly analogous procedures set forth in Rule 3:8-2.

I.

Background of the Parties and This Litigation

Defendants are the parents of twins, A.S. and B.S., born in December 2012. Defendants entered into an agreement in 2013 to share joint legal custody of the children. Defendant G.S., the mother, was designated as the primary residential custodian, and defendant K.S., the father, who had more recently become involved in the twins' lives, was afforded visitation with them supervised by G.S.

4

In 2014 the Division of Child Protection and Permanency ("the Division") received two referrals concerning these children: (1) a report of a July 2014 domestic violence incident between defendants, which allegedly occurred in the presence of the children and resulted in G.S.'s arrest for simple assault of K.S.; and (2) a report that G.S. had been arrested in October 2014 for engaging in shoplifting while the children were in her company. Defendants claimed they were no longer in a relationship at that time. They both denied having a history of substance abuse or domestic violence. The Division found the allegations were not established and at that point closed the case.

On January 29, 2015, the Division received a third referral concerning this family, this time from the twins' paternal grandmother. She reported that the children had been left in her care ten days earlier, when defendants, who she claimed were using heroin, had been involved in a physical altercation. The Division's ensuing investigation revealed to it that during an argument in the children's presence, G.S. accused K.S. of stealing her phone, broke the top off of a glass bottle, and then stabbed K.S. in the arm.

G.S. was consequently charged with committing aggravated assault with a weapon as an act of domestic violence. K.S. stated to the Division that G.S. was a heroin addict. He denied using

5

heroin himself, but admitted to using Xanax and Percocet.  G.S.,
meanwhile, denied using heroin.  She did not believe that K.S.,
who had used heroin in the past, was currently using it because
he had "completed detox."  Drug screens conducted on January 30,
2015 revealed that G.S. tested positive for opiates and morphine,
and that K.S. tested positive for opiates, morphine, and oxycodone.
G.S. later admitted to using heroin.

On February 5, 2015, the Division performed an emergency (or
"Dodd" removal[1]) of the children from defendants' care, based on
G.S.'s admission to using ten bags of heroin a day; K.S.'s
admission of misusing prescription medication; and both parents
having tested positive for opiates and morphine.  At the request
of G.S., the children were placed by the Division with their
maternal aunt, in whose care they remain to date.  The Division
located K.S. later that night, who said at that time he "hoped
that the children could be with their maternal aunt."

Four days later, the Division filed an order to show cause
and a verified complaint in the Family Part seeking the care,
custody, and supervision of the children under Title Nine, N.J.S.A.
9:6-8.21 to -8.73 (regarding abuse and neglect), and also under

---

[1] A "Dodd removal" refers to the emergency removal of a child
without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21
to -8.82.  N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J.
17, 26 n.11 (2011).

6

Title Thirty, N.J.S.A. 30:4C-12 (regarding the care and supervision of children). The application was mainly based on defendants having tested positive for opiates and morphine and their admitted drug use.

The OPR assigned two deputy public defenders from the same regional field office, OPR-Central, to represent G.S. and K.S. at the initial court hearing. As we will discuss infra, there are currently eight regional OPR offices that cover the State's twenty-one counties.[2] The OPR-Central regional office handles cases arising in Middlesex and Monmouth counties.

According to her certification filed with the Family Part after the concerns about potential conflicts in this case arose, the staff attorney assigned to represent the father specifically informed him before the initial post-removal hearing in February 2015 that there were safeguards within the OPR office, described in more detail infra, to "ensure confidentiality for each client." The staff attorney further advised K.S. that a "process of review" had been undertaken to determine whether a potential for conflict existed. She explained to K.S. that the trial court "would likely question him regarding his understanding of any possible conflict of interest," stemming from the fact that two staff attorneys from

---

[2] See Office of the Public Defender, Regional Office of Parental Representation Offices, http://www.nj.gov/defender/regional/#3 (last visited November 16, 2016).

7

the same OPR office had been assigned to represent different clients in the case. According to the attorney's certification, K.S. responded that he understood her disclosures, and said that he wanted her to represent him. There is no indication in our record that K.S. signed a written waiver of a potential conflict, or that his assent was otherwise documented in any manner, aside from his signing the generic Public Defender application form.

The certification filed by the OPR staff attorney for the mother did not address whether she had made similar representations about the potential for conflict to G.S. at the outset of the case. However, as a separate certification from OPR-Central's managing attorney attests, the OPR has a standard protocol regarding the assignment of staff attorneys to co-defendants in the same case, and the protocol was followed here. As part of that protocol, which we discuss more extensively, infra, the OPR staff attorneys are required at the outset of each case to evaluate whether it presents a potential conflict of interest that could result in a significant likelihood of prejudice to either or both defendants. In any event, the two assigned OPR staff attorneys have separately and continuously represented K.S. and G.S. since the inception of this case in February 2015.

At the conclusion of the February 9, 2015 hearing, the trial court found that the Division's emergency removal was required due

8

to imminent danger to the children's lives based on defendants' substance abuse, but not domestic violence. The court issued an order to show cause granting the Division care, custody, and supervision of the children and awarding defendants supervised visitation. The court further ordered: defendants to submit to substance abuse evaluations; G.S. to attend inpatient substance abuse treatment; the Division to find a suitable domestic violence program for G.S.; and K.S. to meet with the Division's domestic violence liaison. Defendants consented to the Title Nine removal of the twins and agreed to the court-ordered services.

During a compliance review hearing in September 2015, the Division withdrew its Title Nine abuse and neglect claim against defendants because it found that the allegations were "not established." By order entered on that date, G.S. and K.S. consented to the continuing jurisdiction of the court for the provision of substance abuse services pursuant to N.J.S.A. 30:4C-12. G.S. singularly was ordered to engage in a batterer's intervention program. G.S. subsequently received substance abuse treatment, but she unfortunately relapsed.

The Parents' Divergent Permanency Plans

On February 1, 2016, after the children had been in placement with the maternal aunt for twelve months, a permanency hearing was scheduled before the Family Part in accordance with N.J.S.A. 30:4C-

9

61.2(a)(2). The Division requested that the permanency goal change from reunification to Kinship Legal Guardianship ("KLG") with the maternal aunt pursuant to N.J.S.A. 30:4C-90. The staff attorney for G.S. represented to the court that her client, who was not present in court that day because she had been incarcerated on a separate offense, agreed with that goal and opposed reunification of the twins with K.S. Meanwhile, K.S., who was present in court that day and who was pursuing substance abuse treatment, disagreed with the mother's position. According to the representations of his own staff attorney, K.S. sought a goal of reunification of the twins with him once he obtained a stable residence.

The Law Guardian requested a three-month extension to afford K.S. an opportunity to present an appropriate permanency plan. The Law Guardian noted to the court that the children "very much enjoy[ed]" their visits with their father, which were apparently conducted at the paternal grandmother's house. The trial judge agreed with the request, issuing an order on that date granting a permanency plan extension of one month to enable K.S. to find suitable housing and continue his substance abuse treatment.

The Conflicts Issue Identified and Addressed

At the conclusion of the February 1 hearing, the trial judge sua sponte raised the issue of whether a potential for prejudicial conflict existed because the parents had submitted competing

10

permanency plans. The staff attorneys responded that they did not think there was a conflict, but agreed to speak to their managing attorney about it. Consequently, in the permanency order issued that day, the judge directed the parties to submit briefs on the conflicts issue.

Later that same day, G.S.'s attorney discussed the judge's concerns with her client. According to her certification, she explained to G.S. that she could continue to provide G.S. with independent legal representation, and advocate for her position notwithstanding that another attorney from OPR-Central would seek a different outcome for K.S., and that each attorney operated independently and would protect client confidences. There is no indication in our record that G.S. executed a written conflicts waiver. Nor does the record contain a conflicts waiver signed by K.S.

The trial judge conducted an initial oral argument on the conflicts issue on February 25, 2016. The staff attorneys argued that they should be permitted to continue representing each of the parents because there was no per se conflict of interest as a result of their representation. They further asserted that under analogous principles in Bell, supra, 90 N.J. at 173, the OPR was responsible for making the determination of whether there was an actual or potential conflict. The staff attorneys argued that the

11

OPR's conflict assessment was subject to "substantial deference" by the court, and was not appropriate for judicial review because it would involve the consideration of potentially privileged communications. Counsel admitted that they did not know what decision-making process was used by the OPR in determining whether to assign outside pool attorneys in multiple-representation cases. The Division and Law Guardian took no position at that time, except the Division argued that if the court found a conflict, defendants should be required to place any waiver of that conflict on the record.

In a written decision issued on March 17, 2016, the trial judge found that there was an actual conflict of interest between G.S. and K.S. from which prejudice would be presumed. The judge perceived that there was "very little in the way of 'identity of interests'" between defendants. As the judge described it, the matter began as a result of domestic violence, and neither defendant had shown an effort to dispel that atmosphere through counseling. The judge further noted that defendants "initially sought to portray the other as the one with an addiction to heroin, while at the same time denying [his or her] own involvement."

Thereafter, K.S. showed positive results to substance abuse treatment, but G.S. relapsed. The judge also observed that defendants each sought at the permanency hearing to obtain a more

12

favorable relationship with the children at the expense of the other, insofar as G.S. sought a permanency goal of KLG with a relative who could "presumably be friendlier to her," whereas K.S. sought to have the children reunified with him, thereby controlling G.S.'s access to the children.

As a result, the judge directed the parties, in accord with analogous principles for criminal cases under Rule 3:8-2, to appear at a hearing to address the apparent conflicts and whether defendants wanted to enter a knowing and voluntary waiver. The judge held that if both parents entered conflicts waivers, the matter would be resolved, but if either parent did not waive, "the court will be forced to require one or both OPR attorneys to withdraw from the case."

Beyond this case-specific ruling, the judge announced in his written opinion that he would institute the following procedural framework in all cases currently on his Children-In-Court docket where staff attorneys from the same OPR office represented co-defendant parents:

> In the future, at the outset of any case where the Public Defender wishes to employ two OPR staff attorneys to represent the parents, the court will expect full compliance with State v. Bell and R.[]3:8-2. It will expect a motion to be made on the record seeking permission for dual representation of the parents. It will hear and evaluate the motion using the same procedures it has outlined above.

13

On March 22, 2016, the judge issued an order granting K.S.'s request to adjourn the permanency hearing, which had been scheduled for that date, "so that [the] defense may review the [March 17, 2016] Opinion and decide whether or not to ask for a stay."

Defendants moved for reconsideration of the court's March 17, 2016 ruling. Defendants argued that the court erred in applying Rule 3:8-2 to a Family Part matter and also in its application of Bell, supra, 90 N.J. at 173. Defendants argued that different permanency goals, standing alone, do not constitute a prejudicial conflict that would disqualify the public defenders from representing defendants. Defendants also expressed concern that, in reaching its decision, the court did not have the benefit of reviewing the measures that have been put in place by OPR-Central to insure that each defendant was provided with independent counsel fully able to preserve confidences and represent his or her client's interests.

The trial judge conducted oral argument in May 2016 on the motion for reconsideration. The two staff attorneys appeared on behalf of their clients. G.S. was present, but K.S. was not because he had been hospitalized for a drug overdose. In addition, an OPR appellate attorney appeared for the first time in the matter to present oral argument on behalf of both defendants and offer historical background about how the OPR shifted from a

14

representation model that relied heavily on pool attorneys to a model that now generally utilizes staff attorneys. The OPR appellate attorney urged the court to allow the conflicts issues to be addressed internally within the OPR, and that the court should give substantial deference to the OPR's handling of these issues. The Division took no position on the conflicts issues. The Law Guardian argued that there was at least a potential for conflict, which should be addressed as quickly as possible.

The trial judge denied the motion for reconsideration. In a lengthy written opinion issued on June 14, 2016, the judge again found that defendants here were "in clear conflict" from which prejudice may be presumed. The judge rejected the OPR's contention that a court has no further role in a conflicts matter once it is satisfied that the "prophylactic measures" are in place and that the staff attorneys are committed to "fidelity and independence." The judge expressed concern that the court and the parties might not know if such safeguards were being followed by the OPR, and even if they were followed, the safeguards might not address every possible conflict. For example, the judge was troubled by his impression that the OPR does not currently have in place "a policy to require that each staff attorney be assigned a separate

15

investigator," nor would the OPR "commit to that being a requirement in the future."[3]

In denying reconsideration, the judge also stated in his opinion that he would adhere to the following protocol in all cases where the OPR seeks to have staff attorneys from the same office represent parents in child welfare cases. The judge's protocol may be summarized as follows:

> 1. The OPR must first apply to the court at the outset for permission to represent both parents. During that hearing, the OPR has the burden to: explain why it cannot follow the "norm" set forth in Bell, supra, 90 N.J. at 174, and assign co-defendants to outside pool counsel; and show why joint representation by staff attorneys is the "last resort available" to the OPR. "Joint representation" will be denied if the OPR fails to establish either factor.
>
> 2. If the OPR establishes the above threshold factors, the court will then conduct a thorough examination on the record and in the presence of the defendants, regarding any information indicating a real or potential conflict between the defendants.
>
> 3. If the court is satisfied that a real or potential conflict exists, it may seek knowing, willing and voluntary waivers from the defendants. If a waiver is obtained, the court will "consider this as a part of the overall circumstances to be evaluated on the issue of joint representation."

---

[3] At oral argument on appeal, the OPR appellate attorney represented to this court that separate investigators are assigned to the attorney for each parent, although that practice was not documented in the trial court.

16

4. If either parent does not waive the conflict, and there is evidence of a present conflict, the OPR will be directed to assign pool attorneys for the parents. If only a potential conflict has been identified, the court will determine whether there is a significant likelihood of prejudice such that pool attorneys will be required. And, on proof of no prejudice to the other parent from allowing opposing staff attorneys to remain in the case, the court may grant the OPR's request.

Defendants moved again for reconsideration and other relief, including a stay of the trial court's rulings to accommodate the filing of a motion for leave to appeal with this court. The trial court granted the request for a continuation of the stay in an order on August 2, 2016. In an attached written statement of reasons, submitted pursuant to Rule 2:5-6(c), the judge clarified that he had not yet disqualified either of the OPR-Central staff attorneys from representing defendants. Instead, he had only directed counsel to appear for a hearing as to "whether the continued representation of one or both parents by staff attorneys from the same OPR office is warranted."

The Present Appeals

Subsequently, we granted leave to appeal to G.S. (A-5222-15T2) and K.S. (A-5223-15T2), consolidated and accelerated those appeals, granted defendants' application to extend the stay pending appeal, and directed that the record shall include the trial judge's August 2, 2016 Statement of Reasons. Because of the

17

importance of the issues affecting the practice of law and a lawyer's ethical responsibilities, we invited the New Jersey Bar Association to appear as amicus curiae. The Bar Association kindly accepted our invitation, filing a brief and also appearing at oral argument. In the meantime, the permanency hearing for the children in the trial court has been adjourned.

Although there is substantial agreement among the respective positions taken by counsel on the appeal, the Law Guardian differs with the position taken by defendants through the OPR appellate attorney as to whether a hearing was warranted in this case to explore conflict issues after the parents had advocated divergent parenting plans. The OPR appellate attorney maintains that the competing plans and the other circumstances here do not rise to the level of a prejudicial conflict warranting judicial inquiry. In any event, the OPR appellate attorney maintains that adequate client waivers have been procured to remediate any such presumed conflicts of interest.

The Law Guardian, however, argues that there is a sufficient concern of potential conflict here to justify the trial court's inquiries into the topic and its decision to order a hearing to explore the issue. In that regard, the Law Guardian expresses concerns that if the representation of both staff attorneys continues without being judicially validated in some way at this

time, the children might be disadvantaged by continued delay and uncertainty if either or both parents claim on appeal from a final permanency order that their trial attorney was compromised, and the result below was thus tainted.

The Bar Association declines to take a position on whether a hearing is justified in this case, but instead presents broader principles relating to the assignment of defense counsel in <u>Title</u> Nine and <u>Title</u> Thirty cases and the importance of presumptively deferring to the professional judgment of the attorneys involved.

All three counsel who substantively briefed the appeal agree that the principles for civil representation of parents in a <u>Title</u> Nine or <u>Title</u> Thirty action are not identical with those in a criminal defense context addressed in <u>Bell</u> and <u>Rule</u> 3:8-2. They all respectfully contend that the prospective guidelines announced by the trial court — including a demonstration at the outset of a child welfare case that no pool attorneys are available in the county to represent the co-defendant parents — are unwarranted. They maintain that the OPR's general arrangement of allowing two staff attorneys in the same office to represent these parents, with appropriate screening, should be presumptively allowed unless a case-specific conflict emerges. The Division and the Attorney General continue to take no position.

II.

19

## The Parents' Rights to Effective Representation

Parents in New Jersey charged with civil abuse and neglect under _Title_ Nine or who are subject to _Title_ Thirty termination proceedings have a constitutional right to counsel under the due process guarantees of Article I, paragraph 1 of the State Constitution, and a statutory right under _N.J.S.A._ 9:6-8.43(a), 9:6-8.30(a), and 30:4C-15.4(a). _N.J. Div. of Youth & Family Servs. v. B.R._, 192 _N.J._ 301, 305 (2007); _N.J. Div. of Youth & Family Servs. v. E.B._, 137 _N.J._ 180, 186 (1994); _Crist v. N.J. Div. of Youth & Family Servs._, 135 _N.J. Super._ 573, 576-77 n.2 (App. Div. 1975). The statutory and constitutional rights of the parent must be "scrupulously protected." _N.J. Div. of Youth & Family Servs. v. G.M._, 198 _N.J._ 382, 397 (2009).

A right to counsel is "the right to the effective assistance of counsel." _McMann v. Richardson_, 397 _U.S._ 759, 771 n.14, 90 _S. Ct._ 1441, 1449 n.14, 25 _L. Ed._ 2d 763, 773 n.14 (1970). In cases brought against a parent by the Division, the effectiveness of defense counsel is assessed by the two-part test set forth in _Strickland v. Washington_, 466 _U.S._ 668, 687, 104 _S. Ct._ 2052, 2064, 80 _L. Ed._ 2d 674, 693 (1984), applicable in criminal cases. _N.J. Div. of Youth & Family Servs. v. B.H._, 391 _N.J. Super._ 322, 345 (App. Div.), _certif. denied_, 192 _N.J._ 296 (2007). That test examines whether (1) the attorney's performance was deficient and

20

(2) whether the deficient performances actually prejudiced the client. Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. See also RPC 1.1 (imposing on lawyers the ethical duty of competence).

To be effective, counsel "must provide the client with undivided loyalty and representation that is 'untrammeled and unimpaired' by conflicting interests." State v. Norman, 151 N.J. 5, 23 (1997) (quoting State v. Bellucci, 81 N.J. 531, 538 (1980)). "[A]n attorney hobbled by conflicting interests that so thoroughly impede his ability to exercise single-minded loyalty on behalf of the client cannot render the effective assistance guaranteed by our constitution." State v. Cottle, 194 N.J. 449, 467 (2008).

Indigent parents in Title Nine and Title Thirty proceedings are entitled to representation provided through the Office of the Public Defender. N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 113 (2011) (citing N.J.S.A. 9:6-8.23(a),(b); N.J.S.A. 9:6-8.43(a); N.J.S.A. 30:4C-15.4). See also In re Adoption of Child by J.E.V., 226 N.J. 90, 106 (2016) (due process guarantee requires appointment of counsel to some indigent litigants). "Simple justice demands nothing less in light of the magnitude of the consequences involved." Crist, supra, 135 N.J. Super. at 575. A child who is the subject of a Title Nine or Title Thirty proceeding is also entitled to representation by counsel employed

21

in a separate unit of the Public Defender's Office, referred to as a "law guardian." J.B. v. W.B., 215 N.J. 305, 332 (2013) (citing N.J.S.A. 9:6-8.21(d); N.J.S.A. 9:6-8.23; N.J.S.A. 30:4C-15.4(b)).

History of the Public Defender and the Creation of the OPR

The Office of the Public Defender was established in 1967 under the Public Defender's Act, N.J.S.A. 2A:158A-1 to -25, to replace "the assigned counsel system with a statewide program for the defense of indigents at public expense." State v. Western World, Inc., 440 N.J. Super. 175, 193-94 (App. Div. 2015), certif. denied, 225 N.J. 221 (2016). The Public Defender was initially required to provide representation, and all necessary services and facilities of representation, to indigent criminal defendants charged with an indictable offense. N.J.S.A. 2A:158A-5.

Subsequent legislation in 1974 assigned that right of representation to abuse and neglect proceedings under Title Nine, N.J.S.A. 9:6-8.43(a),[4] and in 1999 to termination cases under Title Thirty, N.J.S.A. 30:4C-15.4. Thereafter, the Public Defender created the OPR, formerly known as the Parental Representation Unit ("PRU"), to represent parents in both Title Nine and Title

---

[4] In 1974, the responsibility for providing counsel for parents in Title Nine cases was assigned to the then-established Department of the Public Advocate. See Office of the Public Defender, History, http://www.nj.gov/defender/history/ (last viewed on November 16, 2016); E.B., supra, 137 N.J. at 186.

22

Thirty cases.

The Public Defender is empowered to appoint deputy public defenders, N.J.S.A. 2A:158A-6, and also to maintain and compensate "trial pools of lawyers" on a case-by-case basis. N.J.S.A. 2A:158A-7(c),(d). Pool attorneys may be engaged "whenever needed to meet case load demands, or to provide independent counsel to multiple defendants whose interests may be in conflict." N.J.S.A. 2A:158A-9 (emphasis added).

All communications between the defendant clients and any lawyers in the Public Defender's Office "shall be fully protected by the attorney-client privilege to the same extent and degree as though counsel has been privately engaged." N.J.S.A. 2A:158A-12. The Public Defender's Office has the ultimate responsibility to represent the client and is the client's attorney of record, regardless of whether the lawyers it assigns are staff or pool attorneys. Turner v. Dep't of Human Servs., 337 N.J. Super. 474, 478 (App. Div.), certif. denied, 168 N.J. 294 (2001).

The statutory scheme prescribes that the Public Defender is to make selections of staff and pool attorneys "on a basis calculated to provide the respective defendants with competent counsel in the light of the nature, complexity and other characteristics of the cases, the services to be performed, the status of the matters, and other relevant factors." N.J.S.A.

23

2A:158A-8.  In selecting attorneys to serve as counsel for indigent parents, the Public Defender's Office also must:  (1) consider an attorney's willingness to make a commitment to represent a parent; (2) ensure that an attorney has received proper training; and (3) provide for an internal administrative unit to supervise, evaluate, and select non-staff counsel to represent indigent parents independently from the Office of Law Guardian.  N.J.S.A. 30:4C-15.4(c)(1)-(3).  Decisions by the Public Defender concerning the representation of parents are to be made by staff who have no actual involvement in the day-to-day representation of children provided by the OLG.  N.J.S.A. 30:4C-15.4(c)(3).

The Post-2004 Reforms

From 1974 to the mid-2000s, the general practice in Title Nine proceedings was for the Public Defender to assign an attorney in the OLG to represent the child, and to assign separate pool attorneys to represent the parents.  N.J. Div. of Youth & Family Servs. v. E.B., 264 N.J. Super. 1, 6 (App. Div. 1993), aff'd, 137 N.J. 180 (1994).[5]  That practice changed, however, in 2004, when,

---

[5] Prior to an amendment in 1977, N.J.S.A. 9:6-8.21 defined an "attorney" for an indigent parent as "a pool attorney" from the Public Defender "appointed in order to avoid conflict between the interests of the child and the parent[.]"  L. 1974, c. 119. N.J.S.A. 9:6-8.21 currently defines an "attorney" for an indigent parent as "an attorney from the Office of the Public Defender or an attorney appointed by the court who shall be appointed in order to avoid conflict between the interests of the child and the parent or guardian in regard to representation." (Emphasis added).

as part of the State's comprehensive reform of the child welfare system, the Public Defender transitioned from a model primarily utilizing pool attorneys, which had received criticism, to a model utilizing staff attorneys more often.

The State's reform plan was developed as part of a settlement reached in a federal class action filed on behalf of children in the Division's care.[6]  Among other things, the plan was designed to improve legal representation of indigent parents.  The reform plan provided in relevant part that:

> Children are represented by the Law Guardian Unit of the . . . [Public Defender], which has a large in-house staff.  Parents are also represented by the [Public Defender], which has a small in-house staff for this purpose (the parental representation unit, PRU, which mainly handles appeals, with almost all the trial level representation being handled by pool private sector attorneys paid on an hourly basis for this work.)  This model raises several concerns.
>
> [A New Beginning:  The Future of Child Welfare in New Jersey, at 146 (June 9, 2004), available at http://dspace.njstatelib.org:8080 /xmlui/handle/10929/25777 (emphasis added).]

The reform plan went on to detail those concerns, including the following criticisms of heavy reliance on pool attorneys:

> [B]ecause most of the parental representation is not institutionalized, but handled by the individual pool attorneys, most parents are

---

[6] See Charlie H. v. Whitman, 83 F. Supp. 2d 476 (D.N.J. 2000) (addressing a motion to dismiss filed in the federal class action).

> represented by counsel without reliable access to ongoing training, support (from paralegals, investigators, or the like) or supervision, which cannot but affect the quality of parental representation. Parents are often represented by different attorneys during the course of their cases, undermining both the quality of representation and the parents' confidence in the operation of the system as a whole, at a time of particular legal and emotional vulnerability.
>
> [Ibid. (emphasis added).]

In accordance with the reform plan, the Child Welfare Panel engaged as consultants Professor Martin Guggenheim of New York University School of Law, and Craig Levine, Senior Counsel for the New Jersey Institute for Social Justice. These consultants asserted in their report that the pool attorney system had contributed to the inadequate representation of indigent parents because the pool attorneys were often unprepared, undertrained, underpaid, and improperly managed. Martin Guggenheim & Craig Levine, Report to New Jersey Child Welfare Panel on the Representation of Parents in Child Welfare Cases (May 2005) at 7-9.[7] They recommended that to the extent pool attorneys would continue to be used in conflict cases with multiple parents, it was important to implement a meaningful evaluative tool for their

_____

[7] Available at https://dspace.njstatelib.org/xmlui/bitstream/handle/10929/40775/c5362005g.pdf?sequence=1&isAllowed=y (last viewed on November 16, 2016).

A-5222-15T2

performance.  Id. at 35.  Further, they recommended that representation be housed in separate institutions — one for so-called "primary" and another for so-called "secondary" parents — which might decrease the need for retaining pool attorneys.  Id. at 26-27, 35.

In a public report submitted in June 2005, the Interagency Council for Children and Families (the "ICCF"), the agency charged with ensuring the timely implementation of the reform plan, described the aim of the Public Defender's transformation to a predominantly staff-based system for the representation of indigent parents.  According to the ICCF, the transformation was designed "both to increase the quality and accountability of legal counsel and to ensure the presence of legal counsel for parents from the earliest possible opportunity in a child welfare proceeding."  Interagency Council for Children & Families, Public Report, at 3 (June 30, 2005).[8]  To that end, the OPR hired additional staff attorneys, opened new offices, and hired new investigators.  Id. at 3-4.  In addition, the OPR "continue[d] to maintain a list of seasoned pool attorneys for cases with multiple defendant parents and [to] manage such trial assignments to ensure timely selection of legal counsel for those cases[.]"  Id. at 5.

---

[8]    Available    at    https://dspace.njstatelib.org/xmlui/ handle/10929/30082 (last viewed on November 16, 2016).

27

This transition from a predominantly pool attorney model to a predominantly staff attorney model took longer than expected. According to the OPR, the transition was not fully implemented on a state-wide basis until September 2013.

Conflicts Protocols

Under the former system that had been in effect from 1974 to 2013, few issues of conflict-of-interest would have arisen, because parents were then mainly represented by pool attorneys from separate firms and children were represented by the OLG, an entirely separate office within the Public Defender.[9] "OLG and OPR are kept administratively separate to avoid any appearance of conflict [between counsel for children and their parents] in these cases." Office of the Public Defender, supra, History.

The OPR recognized that under the revised system, a potential for conflict could arise from the fact that staff attorneys from the same OPR office can be assigned to represent co-defendant parents. According to the Guggenheim report, approximately one-third of the OPR's cases involve multiple parents and require the

_____

[9] Separate law guardians are also appointed if there is a conflict of interest among the children. See, e.g., N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 61-62, 69 (App. Div.) (appointing four separate law guardians to children in a termination case), certif. denied, 174 N.J. 39 (2002). Although there are parallel issues of how best to deal with client conflicts with respect to the Law Guardian, those issues are not posed in this appeal, and we therefore do not address them.

assignment of a second attorney. Guggenheim & Levine, supra, at 26-27. To address that concern, the OPR chose not to adopt the "primary"/"secondary" client model suggested by Guggenheim and Levine, but instead established protocols for staff attorneys, to insure confidentiality and to protect independent advocacy when they are representing parents in child welfare cases. If, however, a determination is made that there is a potential conflict of interest and a significant likelihood of prejudice, representation is assigned to a pool attorney.

The record does not contain any written guidelines issued internally by the OPR detailing the protocols for representation by staff attorneys within the same office representing two parents in the same case. However, the record does contain a certification from the managing attorney of OPR-Central describing those existing protocols. The managing attorney explained that beginning in 2013, the OPR instituted a state-wide program of staff attorney representation of co-defendants in civil child welfare matters. A "critical component" of the program was to insure that staff attorneys considered potential conflicts.

According to the managing attorney's certification, "[s]taff attorneys were instructed to review each case at the onset and determine if the circumstances demonstrated a potential conflict of interest and a significant likelihood of prejudice to either

29

or both defendants." If the staff attorney found a potential conflict, the attorney was directed to immediately bring the case to the managing attorney's attention for further assessment. Cases in which a final determination was made "that a potential for conflict exists that could result in a significant likelihood of prejudice" were immediately reassigned to a pool attorney — a result OPR-Central has had to use in only a "few" cases.

The managing attorney further attested that, before the present case was filed by the Division, the following protocols within the OPR had been "continuously implemented to insure confidentiality and to preserve independent advocacy":

> · Each staff attorney representing a co-defendant on the same case has a separate and distinct office and individual filing cabinets to store case files.
>
> · Each staff attorney representing a co-defendant on the same case has a separate secretary assigned and/or must undertake his/her own administrative tasks.
>
> · Each staff attorney representing a co-defendant on the same case is assigned to a separate printer located in different rooms within the office.
>
> · All staff and secretaries are precluded from using the speaker phone function when speaking with clients.
>
> · All staff attorneys are precluded from removing documents from the copier or fax, and must wait for documents to be placed in his/her mailbox by support personnel or the manager.

30

· All staff attorneys have been directed to keep all files secured in cabinets and any work product out of plain view.

· All staff attorneys have been instructed to maintain confidentiality and independent advocacy by insuring conversations with colleagues regarding shared cases are limited to general information and only to that which is not protected by attorney client privilege.

The OPR-Central managing attorney further explained in her certification that she sometimes has conferences with individual staff and pool attorneys about litigation issues and strategies. She asserted that her advice and recommendations to the attorneys are kept confidential, and that no information she learns about the position or strategy of a co-defendant is shared. "In instances where staff attorneys, with the consent of their respective clients, wish to discuss a collaborative case strategy or shared legal question," the managing attorney "meet[s] with both attorneys together to discuss the legal considerations related to their collaborative strategy or shared question." According to the managing attorney, even when such collaborative approaches are pursued, "each attorney is expected to and does independently advocate for his/her client" in the case.

During the motion proceedings before the trial court in this case, the OPR appellate attorney further clarified these customary practices in his representations to the court. He acknowledged

31

that the OPR does not ordinarily assign staff attorneys from other OPR offices to represent co-defendant parents in a case because it does not have offices in every county. Because of logistical impediments, it is difficult to assign counsel to such co-defendants from different regional offices. Instead, the OPR generally utilizes two staff attorneys from the same office, with the screening protocol described in OPR-Central's managing attorney's certification. The OPR's appellate attorney acknowledged to the trial court that there was no "standard script" for staff attorneys to explain to clients the risks of such representation arrangements out of a common office.

## III.

Mindful of this important history and background information, we now address the issues raised on appeal. In essence, the issues fall into three clusters: (1) the identification of actual or potential conflicts arising from OPR staff attorneys within the same office representing co-defendant parents; (2) whether such conflicts may be waived, and, if so, how; and (3) the appropriate role of the court. We examine them in turn.

## A.

#### The Identification of Conflicts

The OPR, Law Guardian, and amicus in this case all agree with the fundamental principle that it is vital to safeguard against

32

conflicts of interest that might compromise the integrity or quality of representation of indigent parents in defending <u>Title</u> Nine and <u>Title</u> Thirty actions. Their arguments differ over what precisely comprises such conflicts of interest, and over when specifically measures must be taken to address actual or potential conflicts.

Fundamentally, a lawyer owes his or her client the key responsibilities of confidentiality and loyalty. <u>In re Op. No. 653 of the Advisory Comm. on Prof'l Ethics</u>, 132 <u>N.J.</u> 124, 129 (1993). From that duty "issues the prohibition against representing clients with conflicting interests." <u>Ibid.</u> "The prohibition against lawyer conflicts of interest is intended to assure clients that a lawyer's work will be characterized by loyalty, vigor, and confidentiality." <u>Restatement (Third) of the Law Governing Lawyers</u> § 122 comment b (2000). The risk in representing clients with conflicting interests is that a lawyer's divided loyalty will result in less vigorous representation of both clients, and that the lawyer will use confidences of one client to benefit the other. <u>A. v. B.</u>, 158 <u>N.J.</u> 51, 57 (1999).

The Rules of Professional Conduct, which address conflicts of interest, are indisputably applicable to lawyers assigned by the Office of Public Defender in either a civil or criminal context. <u>N.J.S.A.</u> 2A:158A-13; <u>Bell</u>, <u>supra</u>, 90 <u>N.J.</u> at 169; <u>State</u>

33

v. Noel, 386 N.J. Super. 292, 297 (Law Div. 2005).  Specifically at issue here is RPC 1.7(a), a provision "rooted in the concept that '[n]o man can serve two masters[.]'" State ex rel. S.G., 175 N.J. 132, 139 (2003) (quoting Raymond L. Wise, Legal Ethics 272-73 (1970)).  RPC 1.7(a) prescribes:

> [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.[10]

Hence, pursuant to RPC 1.7(a)(1), one lawyer cannot represent multiple clients with "directly" conflicting interests or interests that "materially limit" the lawyer's advocacy.  A

---

[10] Our Supreme Court largely adopted, with certain modifications, the ABA Model Rules of Professional Conduct in 1984 "'to harmonize New Jersey's standards with the Model Rules and to provide clear, enforceable standards of behavior for lawyers.'"  In re Op. No. 17-2012 of the Advisory Comm. on Prof'l Ethics, 220 N.J. 468, 478 (2014) (quoting State v. Rue, 175 N.J. 1, 14 (2002)).  Restatement (Third) of the Law Governing Lawyers, supra, § 121, defines a conflict of interest as arising "if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person."  See In re Simon, 206 N.J. 306, 316 n.5 (2011) (citing § 121 of the Restatement).

34

conflict of interest may thereby preclude a lawyer from representing co-defendants.

Under RPC 1.10, such a conflict is "imputed to all members of a law firm, disqualifying all if any one would be disqualified." S.G., supra, 175 N.J. at 138. However, in New Jersey, public defenders are not viewed for imputation purposes in exactly the same manner as a law firm of attorneys. See Michels, N.J. Attorney Ethics § 24:2-2 at 600 (2015); Bell, supra, 90 N.J. at 171; State v. Muniz, 260 N.J. Super. 309, 314-15 (App. Div. 1992).

For the reasons we shall discuss, infra, the comparison with private law firms is not perfect. Our courts have addressed these conflict-of-interest concerns in the somewhat analogous context of the representation of co-defendants in a criminal case.

For instance, in Bellucci, supra, 81 N.J. at 545, the Supreme Court held that representation of multiple defendants in a criminal case by a single private attorney or attorneys from the same law firm is barred and implicates the defendants' Sixth Amendment rights to the effective assistance of counsel "unless defendants are fully advised of the potential problems involved." "[O]nce a potential conflict exists, prejudice will be presumed in the absence of waiver . . . even if associated attorneys are involved instead of the same attorney." Id. at 543 (citing State v. Land, 73 N.J. 24, 30 (1977)). As the Court explained in Bellucci,

35

prejudice is presumed when lawyers from the same law firm represent criminal co-defendants because: (1) firm members have access to confidential information; (2) the entire firm shares an economic interest in the clients of each attorney; and (3) public confidence in the integrity of the Bar would be eroded if conduct proscribed by one lawyer could be performed by another lawyer in the firm. Bellucci, supra, 81 N.J. at 541-42.

Multiple representation of defendants in criminal cases by public defenders from the same office does not, however, "in itself give rise to a presumption of prejudice," because the same degree of conflict risks pertaining to private law firms does not exist. Bell, supra, 90 N.J. at 171. The Court in Bell explained that the Public Defender differs from private law firms because public defenders have no financial incentive in retaining clients, and

> [a]s a consequence, the public does not lose confidence in a rule allowing attorneys in the same office to represent joint defendants, even though a single attorney from that office could not handle the cases. Because "the primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State," Branti v. Finkel, 445 U.S. 507, 519, 100 S. Ct. 1287, 1295, 63 L. Ed. 2d 574, 584 (1980), we can expect the public defenders to withdraw from the case whenever joint representation may prejudice their clients. A per se rule requiring counsel from separate offices would therefore needlessly deprive many defendants of competent local public defenders.

36

[<u>Id.</u> at 168-69 (emphasis added).]

The Court in <u>Bell</u> was "satisfied that although the subtle influences that arise from public defenders practicing side by side in the same office may present difficulties in maintaining absolute independence, 'the inbred adversary tendencies of [public defense] lawyers are sufficient protection.'" <u>Id.</u> at 169 (quoting <u>People v. Robinson</u>, 402 <u>N.E.</u>2d 157, 162 (Ill. 1979) (quoting <u>ABA Standards, The Defense Function</u>, at 212-13 (1971))).[11]

For similar reasons, we conclude that there is no per se ethical prohibition upon staff attorneys from within the same OPR regional office representing different parents within the same case, provided that appropriate screening measures are scrupulously implemented. There is no need for us in these appeals to pass upon, item-by-item, the protective measures described in the certification of OPR-Central's managing attorney. We observe

---

[11] <u>See</u> <u>State v. Reardon</u>, 337 <u>N.J. Super.</u> 324, 330 (App. Div. 2001) (conflict of interest based on multiple representation by attorneys from same Public Defender's Office was not supported by record); <u>State v. Scherzer</u>, 301 <u>N.J. Super.</u> 363, 459-60 (App. Div.) (finding no per se conflict in co-defendants represented by public defenders), <u>certif. denied</u>, 151 <u>N.J.</u> 466 (1997); <u>Muniz</u>, <u>supra</u>, 260 <u>N.J. Super.</u> at 314-15 (holding public defender not disqualified from representing a defendant whose victim had been represented by another public defender in the same office on unrelated matter); <u>State v. Rogers</u>, 177 <u>N.J. Super.</u> 365, 367 (App. Div. 1981) (holding joint representation of co-defendants by public defenders from same office did not constitute denial of defendants' constitutional rights to counsel), <u>appeal dismissed</u>, 90 <u>N.J.</u> 187 (1982).

37

that they appear to be appropriately designed to safeguard client confidences, on the whole, and to promote zealous independent representation by the respective staff lawyers for each parent.

We do add two important points of enhancement. First, the described protocol should be expanded to include measures to safeguard electronically stored confidential client information and attorney work product, in a manner conforming with the recently-enacted subsection (f) to RPC 1.6 (eff. September 1, 2016) and the associated Official Comment issued on August 1, 2016. In this digital information age, it is vital that screening measures not be confined to physical case files. The screening must include the protection of electronically stored data, which, for example, might contain confidential attorney notes on client confidences and strategies.[12]

Second, we instruct the OPR to formalize its protocol with written guidelines that are distributed to all staff and managing attorneys, assuming they do not already exist. The OPR's appellate attorney represented that the procedures described in the certification of OPR-Central's managing attorney are followed in all of the OPR's other regional offices statewide. In any event,

---

[12] At oral argument, we were assured by the OPR's appellate attorney that the OPR maintains separate log-in passwords for individual attorneys so that access to sensitive computer files is limited. Beyond this, we recommend that the OPR consider what additional measures are warranted in light of the new RPC subsection.

they ought to be promulgated internally in a more formal manner to assure compliance.

The harder questions presented here concern identifying under what circumstances the mere theoretical possibility for conflict advance to a tangible, case-specific concern that warrants scrutiny and potential corrective action. This potential was explained by the Court in a criminal context in <u>Bell</u>, <u>supra</u>, 90 <u>N.J.</u> at 171-73. In that case, the Court found no conflict where, near the end of the trial, a detective testified, without prior disclosure, that several hours before the burglary he had seen one of the co-defendants carrying a pair of pink pants; the pants were later found with the stolen items. <u>Id.</u> at 171-72. The trial judge overruled defense counsels' objection on the basis of surprise. <u>Id.</u> at 172.

Defense counsel in <u>Bell</u> did not raise the conflict issue until after cross-examination of the detective had been completed. <u>Ibid.</u> The conflict claim was based on the fact that co-defendant Bell alone, without co-defendant Peguese, was seen carrying the pants. <u>Ibid.</u> "No further explanation was given as to how a conflict had developed from this alleged dissimilarity." <u>Ibid.</u> The Court held:

> <u>We fail to see the conflict. The confidentiality of the information was not at issue. The attorney defending Peguese was unfettered in his ability to respond to this</u>

39

> new information. Bell could hardly seek to claim a tactical trial problem related to his co-defendant. Its real burden lay not in any conflict but in its surprise. As noted, the trial court permitted an adjournment to allow counsel to check out the incident but denied a mistrial because the nondisclosure was inadvertent. <u>Two privately retained lawyers would have faced the same problems of trial tactics at that time</u>.
>
> At no time, either at trial or on appeal, have defendants suggested what either trial attorney might have done differently once the conflict arose. Neither defendant took the stand. Peguese's attorney stated that this was his usual trial strategy. Contrast this with <u>Holloway v. Arkansas</u>, 435 <u>U.S.</u> 475, 98 <u>S. Ct.</u> 1173, 55 <u>L. Ed.</u> 2d 426 (1978), where a trial court had ordered one public defender to represent three criminal defendants. He could cross-examine none although their interests differed. <u>Cf.</u> <u>Glasser v. United States</u>, 315 <u>U.S.</u> 60, 62 <u>S. Ct.</u> 457, 86 <u>L. Ed.</u> 680 (1942) (attorney representing two defendants voluntarily refrained from cross-examining prosecution witness because of feared adverse effect on one co-defendant).
>
> [<u>Bell</u>, <u>supra</u>, 90 <u>N.J.</u> at 172-73 (emphasis added).]

Thereafter, in a civil case, <u>In re Petition for Review of Opinion 552 of Advisory Committee on Professional Ethics</u>, 102 <u>N.J.</u> 194 (1986), the Court held that in a Section 1983 civil rights action, "a government attorney is precluded from representing co-defendant government officers or employees only where the allegations or the facts as developed present <u>an actual conflict of interests or the realistic possibility of such a conflict</u>."

40

Id. at 208 (emphasis added). "If no such conflict is presented, then a government attorney may simultaneously represent as co-defendants governmental officers or employees and the government entity." Ibid. The Court cautioned, however, that "[t]his joint representation . . . is conditioned upon the continuing obligation of the attorney to ascertain whether there exist potential conflicts of interests among the defendants, and if, under the circumstances, such potential conflicting interests emerge that outweigh the mutuality or similarity of the interests among defendants." Id. at 208-09 (emphasis added). If that materializes, "the attorney shall be obligated promptly to terminate such joint representation and initiate steps for the separate representation of the defendants." Id. at 209.

The Court explained in Opinion 552 that joint representation of co-defendants "with potentially differing interests is permissible provided there is a substantial identity of interests between them in terms of defending the claims that have been brought against all defendants. The elements of mutuality must preponderate over the elements of incompatibility." Id. at 204. Critical to that determination is whether co-defendants "would present consistent defenses to the claims brought against them." Id. at 205. Thus, "representation of multiple parties may be permitted even if the positions may appear to be somewhat

41

potentially conflicting." Ibid.

Moreover, under the RPCs, representation of clients who are on the same side in the same civil litigation, unlike opposing clients with a direct conflict of interest, does not always present a potential for a conflict of interest, and is not automatically barred. Michels, supra, § 19:2-1(e) at 415. A disqualifying conflict may arise in representing co-defendants "by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." Ibid. (quoting ABA Model Rules of Prof'l Conduct R. 1.7 (2000)). See, e.g., Wolpaw v. Gen. Acc. Ins. Co., 272 N.J. Super. 41, 45 (App. Div.) (requiring a liability insurer to retain separate counsel for co-defendants with conflicting interests), certif. denied, 137 N.J. 316 (1994).

In identifying conflicts, "[t]he critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." ABA Model Rules of Prof'l Conduct, supra, R. 1.7 comment 8.

These principles came into play in a Title Thirty case

42

involving private representation in which a defendant father appealed from an order terminating his parental rights. N.J. Div. of Youth & Family Servs. v. V.K., 236 N.J. Super. 243, 249 (App. Div. 1989), certif. denied, 121 N.J. 614, cert. denied, 495 U.S. 934, 110 S. Ct. 2178, 109 L. Ed. 2d 507 (1990). The Division became aware of the case when the mother called a hotline because she felt "overwhelmed" with the care of her small children. Id. at 250. The parents had "a history of emotional instability and inability to control their behavior," and "would not agree to voluntary placement of the children." Ibid. The trial court heard "extensive testimony of physical and sexual abuse of the two children" by the co-defendant parents in the termination case. Ibid. The parents were also tried on criminal charges of child abuse and were acquitted. Id. at 251.

On appeal in V.K., the father argued, among other things, that private trial counsel should not have represented both him and his wife "as such representation constituted a conflict of interest." Id. at 256-57. He claimed that there was "'no question but that all of the family problems have their root'" in his wife's alleged conduct, and that the conflict was further heightened by the fact that he wanted the children back, while unbeknownst to him, his wife did not. Id. at 257. The Division's attorney had raised a possible conflict of interest concerning the co-

43

defendants' private counsel representing the husband in the related criminal matter, but the husband and wife stated at the time that they did not believe there was a conflict of interest and wanted common trial counsel to represent them in the civil termination trial. Ibid.

We found no support in the record for the father's allegations of a conflict in V.K. Without citing to Bell or RPC 1.7, we held that "[o]ur careful review of the record reveals no conflict of interests between appellant and his wife that would result in prejudice to appellant. Their interests were not divergent; both sought to establish that [the Division's] claim that they had sexually abused their children was groundless." Ibid. (citing United States ex rel. Smith v. New Jersey, 341 F. Supp. 268, 271 (D.N.J. 1972) (where, by comparison, the co-defendants' interests were identical)).

More recently, in New Jersey Division of Youth & Family Services v. N.S., 412 N.J. Super. 593, 639-40 (App. Div. 2010), we held that there was no per se "disqualifying conflict" when "one attorney assumes the tandem roles of counsel for the same defendant in both a Title Nine action and criminal proceedings arising from the abuse or neglect of a child." The concern in allowing dual representation in that case centered on the release of the Division's files under Rule 5:12-3. Ibid. We held that

44

such dual representation by counsel may be allowed "subject to a protective order, which preserves the confidentiality of the source prompting the Division's protective services litigation." Id. at 640.

These cases signify that a conflict of interest that warrants attention in this multiple representation context is one that goes beyond the mere fact that the clients have the status of co-defendants in the same Title Nine or Title Thirty case. The trigger for concern is instead whether there is a manifest particularized divergence between the clients' factual contentions or legal assertions,[13] or the remedies they wish their counsel to advocate. The latter concern implicates the standard of RPC 1.7, i.e., whether the circumstances show "direct" adversity between the clients, see RPC 1.7(a)(1), or, alternatively, whether there is a "significant risk" that the representation of one client will "materially limit" the advocacy of the other client represented by a staff attorney in the same OPR office. See RPC 1.7(a)(2).

---

[13] We refrain from using in this context the term "positional conflict" that is used in some of the briefs on appeal. The use of that term here is misplaced. A "positional conflict" occurs when a lawyer takes inconsistent legal positions in different tribunals at different times on behalf of different clients. See ABA Model Rules of Prof'l Conduct R. 1.7 comment 24 (2000); John S. Dzienkowski, Positional Conflicts of Interest, 71 Tex. L. Rev. 457, 460 (1993).

The American Bar Association has provided some guidance on this subject with specific reference to the representation of multiple parents in abuse and neglect cases by a single attorney. In particular, Standard 14 of the <u>American Bar Association Standards of Practice for Attorneys Representing Parents in Abuse & Neglect Cases</u> (2006) cautions that counsel should "[b]e alert to and avoid potential <u>conflicts of interest that would interfere with the competent representation</u> of the client." (Emphasis added). By illustration, ABA Standard 14 states:

> <u>Action</u>: The parent's attorney must not represent both parents if their interests differ. The attorney should generally avoid representing both parents when there is even a potential for conflicts of interests. In situations involving <u>allegations of domestic violence</u> the [same] attorney should never represent both parents.
>
> <u>Commentary</u>: In most cases, attorneys should <u>avoid representing both parents in an abuse or neglect case</u>. In the rare case in which an attorney, after careful consideration of potential conflicts, may represent both parents, it should only be with their informed consent. <u>Even in cases in which there is no apparent conflict at the beginning of the case, conflicts may arise as the case proceeds</u>. If this occurs, the attorney might be required to withdraw from representing one or both parents. This could be difficult for the clients and delay the case. Other examples of potential conflicts of interest that the attorney should <u>avoid</u> include <u>representing multiple fathers in the same case or representing parties in a separate case who have interests in the current case</u>.

> In analyzing whether a conflict of interest exists, the attorney must consider "whether pursuing one client's objectives will <u>prevent</u> the lawyer from pursuing another client's objectives, and whether confidentiality may be <u>compromised</u>."

> [<u>Ibid.</u> (emphasis added) (citations omitted).]

The ABA Standard does not, however, address whether such conflict problems are ameliorated when different staff attorneys within the same public defender's office separately represent the co-defendant parents.

Another ABA publication has recommended that, when assigning counsel to defend parents in child welfare claims, attorneys should ascertain whether the parents have claims or contentions against each other, particularly domestic violence claims. If so, then the following questions may bear on the conflict analysis:

> · Does representing one client foreclose alternatives for the other?

> · Will confidential information from Client A be compromised in representing Client B?

> · Can the lawyer comply with the duties owed to each client, including the duty to pursue each client's position?

> · Will the client reasonably fear that the lawyer will pursue that client's case less effectively out of deference to the other client?

> · Can the lawyer ask for consent?

> [Jennifer L. Renne, <u>Legal Ethics in Child Welfare Cases</u> 49 (Amer. Bar Ass'n. 2004).]

47

Although we do not necessarily adopt these five questions as comprehensive or dispositive, they do appear to be useful points of inquiry.

The Law Guardian rightly stresses in its arguments that the conflicts analysis in this child welfare context must be dynamic rather than static. As the <u>Title</u> Nine or <u>Title</u> Thirty litigation progresses, the contentions and positions of the parents can often diverge significantly, even if at the outset of the case they had been allied in asserting that no abuse or neglect occurred and that their children should be reunified with them. As time passes, the capacity of each individual parent to be a fit caretaker may improve or deteriorate, due to a multitude of factors such as physical or mental health, substance abuse or treatment, employment, housing, incarceration, domestic violence, parenting classes, social services, and so forth. Likewise, the needs of the children may evolve, and their relationships with each parent may grow or dwindle. The Division's factual contentions may focus more on one parent than another as the case progresses, with shifting degrees of culpability for past harm inflicted upon the children. Expert opinions about each parent may also diverge.

For these many reasons, an initial assessment at the outset of a case that there is no apparent conflict between the parents

48

may become invalid with the passage of time. Hence, it is vital that the conflicts analysis be updated when such changes occur.

To summarize, we conclude that there is no per se prohibition upon, or any presumptive disallowance of, different staff attorneys within the same OPR field office separately representing co-defendant parents in Title Nine and Title Thirty cases. Nevertheless, greater scrutiny of the potential for conflict is required when the parents' factual contentions, legal positions, or remedial preferences materially diverge. The propriety of continued dual representation of both clients out of the same OPR office must be reexamined when such divergence materializes. In particular, in accordance with RPC 1.7, the analysis must focus on whether the clients are now "directly" adverse to one another, or whether their respective staff attorneys are "materially limited" by the circumstances in being able to zealously advocate their interests.

With respect to whether disqualification of one or both staff attorneys is required, the OPR appellate attorney urges that we apply in this child welfare context the language of Bell, focusing on whether there is a "significant likelihood of prejudice" to the clients created by the potential conflict-of-interest. Bell, supra, 90 N.J. at 171. That standard for disqualification may well be sensibly extended from Bell, subject to the broader

49

examination of this general issue by the Court itself or a designated rule-making committee.

However, for the reasons we explain more fully in Part III(C), infra, we disagree with appellants' counsel that a trial court has no role in inquiring into potential conflicts before that threshold of "substantial likelihood of prejudice" is attained. We also do not agree with appellants that the trial judge in this particular case acted prematurely and precipitously in reacting to the conflict potential once the co-defendant parents had advocated competing parenting plans. To the contrary, we agree with the Law Guardian and the amicus that the conflicts concerns may be an appropriate subject of judicial inquiry even before "a substantial likelihood of prejudice" materializes.

B.

Client Consultation and Potential Waiver of Conflicts

Having attempted to define what may constitute a disqualifying conflict in this Title Nine and Title Thirty setting, we turn our attention to the related important subject of client consultation and potential waiver. Here again, the test of the governing ethical rules is instructive.

RPC 1.7(b) provides that:

> Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

50

(1) each affected client gives informed consent, confirmed in writing, after full disclosure and consultation, provided, however, that a public entity cannot consent to any such representation. When the lawyer represents multiple clients in a single matter, the consultation shall include an explanation of the common representation and the advantages and risks involved;

(2) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(3) the representation is not prohibited by law; and

(4) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

[RPC 1.7(b) (emphasis added).]

Multiple representation of the co-defendants by OPR staff attorneys in the present case does not fall under any of the categorical exceptions to client waiver specified in RPC 1.7(b)(2),(3),(4). Defendants' trial attorneys have each certified that they are prepared to continue to provide their respective clients with diligent representation. RPC 1.7(b)(2). Representation of multiple defendants in a Title Nine case is not prohibited by law, RPC 1.7(b)(3), nor have the co-defendants in this case asserted claims against each other in this litigation. RPC 1.7(b)(4). See Michels, supra, § 26:4-1 at 635 ("a lawyer may

51

not simultaneously represent adversaries in a litigation matter, even with the consent of both parties").

Nor does this matter entail the type of conflict of interest that our Court has otherwise recognized as "so egregious" that it "cannot be cured by consent." In re Garber, 95 N.J. 597, 613-14 (1984). The trial judge in this very case recognized that "it is highly unlikely in abuse and neglect cases an attorney could be involved in a conflict so serious in nature that it could not be waived."

By comparison, joint representation of co-defendants in a criminal case can be subject to waiver of conflicts in appropriate circumstances. See Cottle, supra, 194 N.J. at 473; Bellucci, supra, 81 N.J. at 544-45. See also Gary T. Lowenthal, Joint Representation in Criminal Cases: A Critical Appraisal, 64 Va. L. Rev. 939, 956 (1978). That said, if a court finds an actual conflict of interest in a criminal case, "there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented." Wheat v. United States, 486 U.S. 153, 162, 108 S. Ct. 1692, 1698, 100 L. Ed. 2d 140, 150 (1988). That residual judicial authority to disqualify counsel exists here, as well. See, infra, at Part III(C), concerning the court's role.

As the professional ethics rules and related authorities have instructed, in order for client consent to a waiver of attorney

52

conflict to be effective, it must be informed and based on "full disclosure and consultation." RPC 1.7(b)(1). The consent can be reviewed by the trial court for fairness, reliability, and compliance with the Rules of Professional Conduct. State v. Loyal, 164 N.J. 418, 440 (2000) (in which the Court disregarded a client's consent to a conflict in a criminal case, based on the need to maintain public confidence in the judicial system); In re Dolan, 76 N.J. 1, 13 (1978) (reaffirming that a client's consent must be knowing, intelligent, and voluntary).

"Sophistication" of the client is also a factor to be considered in determining whether his or her consent was adequate. Advisory Comm. on Prof'l Ethics Op. 679 (July 17, 1995). See Marshall J. Berger, Disqualification for Conflicts of Interest and the Legal Aid Attorney, 62 B.U. L. Rev. 1115, 1130 (1982) (observing that legal aid clients traditionally lack experience in legal matters). This is of particular concern in the present context of the representation of indigent parents in Title Nine and Title Thirty matters. At times, such indigent parents have limited education, mental health issues, cognitive limitations, and other personal problems that can make it difficult for them to fully appreciate the concepts of an attorney's conflict-of-interest and the respective advantages and disadvantages of changing counsel.

53

The logistics for attorneys obtaining client waivers in business litigation or other civil matters can be more feasible than those confronting lawyers who represent indigent parents. Such parents at times may be harder to locate, meet with, and counsel than other clientele.

Another impediment to waiver in Title Nine and Title Thirty cases is the possibility — which can also arise in the context of indigent criminal defendants — that a defendant parent may refuse to waive a conflict in a deliberate, bad faith effort to stall the case by forcing the substitution of pool counsel or a staff attorney from a different OPR office. A transition to such substituted counsel will consume time, as the new attorney will need to review the case from scratch and prepare for future proceedings. This prospect of delay is particularly worrisome in light of the strong policies that favor achieving permanency of outcomes for children who remain in limbo while Title Nine and Title Thirty cases are litigated. N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 558 (1994).

Consequently, the OPR and the courts have an important role in not allowing clients to withhold conflict waivers in bad faith as a stalling maneuver. In extreme instances where such bad faith exists, the client's demand for a new attorney may be rejected, despite his or her expressed dissatisfaction. Of course, if the

54

assigned attorney is actually compromised and is thereby depriving the client of effective assistance, our appellate courts are empowered to set aside final judgments or fashion other appropriate relief on that basis.  See B.R., supra, 192 N.J. at 306.

We emphasize the importance of client communication about conflict issues, particularly at the outset of the Title Nine or Title Thirty case when the OPR staff attorneys are first assigned to represent co-defendant parents.  Each assigned OPR attorney must discuss with the client the arrangements for the office's representation, including the screening procedures that will be maintained to assure confidentiality and independent advocacy.  On this point, we are troubled that there is no assertion in the certification by G.S.'s staff attorney (unlike that from K.S.'s attorney) that such discussions about conflict with that particular client took place at the outset of this case in 2015.[14]

The discussion with the client and the client's assent to the arrangement should be documented in some uniform manner, either by a standard form or file memorandum that can be evidential if a future problem arises.  In this regard, we do not decide in these appeals whether a written waiver by the client, as prescribed by RPC 1.7(b)(1), is the best means for substantiating the OPR

---

[14] This omission as to G.S., which was perhaps inadvertent, should be addressed on remand.

client's acquiescence. We leave that question to further consideration by the OPR itself, or by a Supreme Court Committee if one is asked to examine these issues.

C.

The Court's Appropriate Role

The final major subject — which perhaps is the main reason why these particular interlocutory appeals were generated — is defining the court's appropriate role in reviewing and taking action on conflict issues implicated by the OPR's current post-reform practice of relying principally on staff attorneys rather than pool counsel to represent co-defendant parents. The OPR contends that the trial court should generally defer considerably to the OPR's professional judgment in dealing "in-house" with such conflicts concerns, and to refrain from conducting sua sponte inquiries into the subject. The Law Guardian and the amicus are more supportive of the court taking a proactive role, although they agree with the OPR that it is generally entitled to substantial deference in handling such conflicts problems.

It is well established that an evaluation of whether a conflict exists in multiple representation cases is initially best addressed by the attorney or attorneys in each case. Opinion 552, supra, 102 N.J. at 206; Bell, supra, 90 N.J. at 173-74. The attorney must be "satisfied based on objective reasonableness that

56

there is no direct adversity between the defendants and that joint representation will not adversely affect the relationship of either class of defendants, RPC 1.7(a), nor materially limit his or her professional responsibilities towards any such client-defendant, RPC 1.7(b)." Opinion 552, supra, 102 N.J. at 206.

"Initially, it is the attorney's obligation when he first meets with his prospective clients to advise them of possible conflicts and of their constitutional rights." Land, supra, 73 N.J. at 32. In keeping with such principles, Bell, supra, 90 N.J. at 175, the Court institutionally "was satisfied that the New Jersey Public Defender is sensitive to the need to appoint outside counsel in cases of potential conflict."

The reasonableness of a lawyer's initial determination concerning a conflict of interest is subject to subsequent review by the court. Restatement (Third) of the Law Governing Lawyers, supra, § 121 comment g. "Although lawyers must engage in self-regulation as an initial matter, when the issue of conflict of interest arises in a disqualification context, the court has a supervisory role to play." Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering, vol. 1 at 236.2 (2d ed. 1992).

Here, the trial judge, who is charged with the duty to enforce the Rules of Professional Conduct under Rule 1:18, had the authority to both raise the potential conflict of interest, sua

57

sponte, and to consider the issue at an evidentiary hearing, if the issue could not be resolved on the written record. State v. Murray, 162 N.J. 240, 250 (2000); Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 222 (1988); Bell, supra, 90 N.J. at 173. We reject appellants' contention that the trial judge here acted prematurely or precipitously in ordering a hearing on the subject and in attempting to ascertain whether sufficient informed client waivers had been procured.

Although we are not persuaded that the history of domestic violence of both parents with one another and their mutual substance abuse posed a sufficient conflict to require client waiver, when the defendants advocated conflicting parenting plans, that event tipped the balance enough to justify the court's sua sponte order for a hearing. The parenting plans were diametrically opposed: the mother's preferred plan was for her to maintain a caretaking role in a KLG with her relative, whereas the father's plan would instead have the children reunified solely with him.

If, for example, an expert witness were called by the mother's attorney to opine on the merits of her plan, the father's attorney would have a strong tactical incentive to impeach that expert through cross-examination or by proffering a competing expert to criticize the mother's plan. That head-on divergence of positions triggered the need to be certain that the two staff lawyers

58

involved were not impeded from advocating their clients' positions and that their clients understood the arrangements within the OPR office and assented to them. We do not go so far as to say that the trial court was required to investigate the conflicts problems, but the court certainly did not abuse its discretion in raising the issue and calling for a hearing with the clients present.

The OPR appellate attorney has expressed concerns about the potential for a conflicts hearing to reveal confidential or prejudicial information inadvertently if the clients testified at such a proceeding. Although those disclosure risks are not fanciful, we are confident that the trial court can structure the inquiries at such a proceeding in a manner that minimizes that risk. By comparison, our criminal courts similarly deal routinely with such disclosure risks at hearings when defendants wish to discharge their assigned counsel and represent themselves. See, e.g., State v. Crisafi, 128 N.J. 499, 509 (1992) (regarding judicial inquiries at hearings to assure a criminal defendant is waiving his right to assigned counsel "knowingly and intelligently").

That said, we discern the need to modify the trial court's rulings here in one significant respect. Although we appreciate the judge's prophylactic good intentions in assuring that the representation of co-defendant parents in Title Nine and Title

59

Thirty cases is not compromised in future cases, the judge erred by importing into this OPR context the specific procedures for criminal representation prescribed by the Court in <u>Bell</u> and further codified in <u>Rule</u> 3:8-2[15] of our Rules of Criminal Practice.

We recognize that <u>Bell</u> detailed, in essence, a hierarchy of preferred arrangements for the representation of indigent co-defendants in criminal cases: first, deeming the use of outside pool counsel as "the norm"; second, "as the next preferable course," assigning deputy public defenders from an adjoining county; and third, as a last resort, providing counsel by multiple staff attorneys within the same local office, with appropriate screening. <u>Bell</u>, <u>supra</u>, 90 <u>N.J.</u> at 174.

We decline to impose an identical hierarchy in this setting, an approach that the OPR, the Law Guardian, and the Bar Association all likewise disfavor for application to <u>Title</u> Nine and <u>Title</u>

---

[15] <u>Rule</u> 3:8-2 provides as follows:

> No attorney or law firm shall be permitted to enter an appearance for or represent more than one defendant in a multi-defendant indictment without securing permission of the court.

> Such motion shall be made in the presence of the defendants sought to be represented as early as practicable in the proceedings but no later than the arraignment so as to avoid delay of the trial. For good cause shown, the court may allow the motion to be brought at any time.

Thirty cases. As a policy matter, the Court's opinion in <u>Bell</u> in 1982 could not have anticipated the reforms of the child-welfare pool attorney system that were recommended in the early 2000s and which have finally been fully implemented. Those reforms conflict with <u>Bell</u>'s treatment of pool attorney representation in criminal cases as "the norm."

Second, there are qualitative differences between criminal litigation, which tends to focus retrospectively on evidence of past events bearing on whether a defendant committed an offense, and child welfare litigation. The latter tends to be more dynamic and forward-looking, and a setting in which the lawyer-client relationship can involve much broader concerns for trial advocacy than disproving past wrongdoing.

Third, the second-preferred option in <u>Bell</u> of using staff attorneys from adjoining counties is not readily feasible here since there are only eight regional OPR offices for the twenty-one counties. The defendant parents consequently may have transportation impediments in traveling to their attorneys' offices.

Lastly, as we have already mentioned, we respectfully suggest that a broader study of these issues by a Committee is preferable to the adoption in these appeals of the trial court's preemptive mandate for a demonstration of the need to use staff attorneys at

61

the outset of every <u>Title</u> Nine and <u>Title</u> Thirty case. In that same vein, we defer to the Supreme Court on whether a Court Rule for Part V children-in-court cases akin to <u>Rule</u> 3:8-2 should be adopted.

For these reasons, we affirm, with this important modification, the trial court's orders calling for a hearing to explore whether the continued representation of G.S. and K.S. by separate staff attorneys within OPR-Central is appropriate under the <u>RPC</u>s; whether the respective clients have waived any applicable conflicts-of-interest with their informed consent; and whether sufficient screening measures within the OPR office are being maintained. The remand hearing on the conflicts issues shall be completed within sixty days. Thereafter, depending on the disposition of that hearing, the litigation may be concluded with appropriate representation.

## IV.

As a final word, we wish to make clear that our discussion of these important representational issues should not be misread as a suggestion that any of the staff attorneys or their supervisors in this case have engaged in unethical or inappropriate conduct. Indeed, the advocacy of co-defendants' competing parenting plans by the two staff attorneys in OPR-Central provides a strong indication of their professional independence in serving

62

their respective clients.

We likewise do not wish to suggest that the trial judge in this case was unjustified in wanting to delve into and resolve the conflicts issues before the case proceeded to a final hearing and final order. In fact, we commend the judge for conscientiously placing an important spotlight on these vital issues, and for his thoughtful written opinions addressing them.

We do not presume in this opinion to resolve all of the institutional issues that are posed here. We hope and respectfully suggest they will be examined more comprehensively and deeply by a designated Supreme Court Committee with, of course, the collective input and wisdom of the OPR, other stakeholders, and experts in the field.

V.

The trial court's rulings on the conflicts issues are accordingly affirmed, as modified. The matter is remanded for a hearing consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION