# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1044-20

IN THE MATTER OF THE
CIVIL COMMITMENT OF
S.W.

_____

Submitted June 7, 2021 – Decided August 17, 2021

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. ESCC-001995-20.

Joseph E. Krakora, Public Defender, attorney for appellant S.W. (Susan Remis Silver, Assistant Deputy Public Defender, on the brief).

Respondent has not filed a brief.

PER CURIAM

In this one-sided appeal, S.W.[1] appeals from the Law Division's November 18, 2020 order civilly committing her to a psychiatric facility.

---

[1] We use initials to protect the privacy of S.W.'s guardianship records. R. 1:38-3(e).

Because we conclude that S.W. was, in effect, denied the assistance of counsel at the commitment hearing, we vacate the order of commitment and remand for a new hearing.

I.

On November 7, 2020, S.W. was brought to a hospital to be screened for possible psychiatric commitment. A mental health screener described S.W. to be "dangerous to self/not suicidal," and reported her history of schizophrenia and inpatient treatment. The screener reported S.W.'s "escalating behavior" and "increasing paranoia" due to her medication noncompliance, and believed she was "in need of inpatient psychiatric treatment."

On November 10, 2020, Dr. Zeshawn Ali, a psychiatrist, diagnosed S.W. with schizophrenia and recommended she be committed. The same day, a Law Division judge entered an order temporarily committing S.W. to a psychiatric facility. The temporary commitment order is blank following the sentence "[t]he following attorney is hereby assigned to represent the patient:".

Consistent with N.J.S.A. 30:4-27.12(a), the court scheduled a hearing for November 18, 2020, to determine whether S.W. needed continued commitment. A November 10, 2020 Notice of Hearing, which was served on the Office of the Public Defender, states: "The attorney appointed by the court to represent the

A-1044-20

patient is NORA R. LOCKE. Private counsel may be retained by the patient, if desired." Deputy Public Defender Nora Locke is the managing attorney of the Public Defender's Division of Mental Health Advocacy. Locke assigned Assistant Deputy Public Defender Daniel O'Brien to represent S.W. at the commitment hearing. See N.J.S.A. 52:27EE-35.

P.W. is S.W.'s sister. She claims to have been appointed S.W.'s general guardian. After issuance of the temporary commitment order, P.W. hired attorney Thomas Vigneault. On November 17, 2020, Vigneault sent O'Brien a letter marked "Notice of Appearance" that stated:

> My name is Thomas Vigneault, my firm has been retained to represent S.W. in the commitment court proceeding scheduled for Wednesday November 18th through her Guardian [P.W.]. [P.W.] has sole and absolute authority to make all and any decisions for S.W. including retaining the attorney [P.W.] chooses.

It is not clear from the record whether Vigneault's letter was presented to the trial court. The letter was not entered into evidence or marked for identification at the commitment hearing.

A-1044-20

On November 18, 2020, a municipal court judge held S.W.'s commitment hearing via electronic technology.[2] At the hearing, Vigneault entered an appearance, stating that he represented both "the guardian and the patient S.W." O'Brien attempted to enter his appearance on behalf of S.W. He informed the court that, "I have spoken to my client, . . . S.W.," and "[y]esterday, . . . she indicated she wanted public defender representation . . . ." O'Brien told the trial court "S.W. said she doesn't wish to be represented by the attorney who was retained by her sister." He also argued Vigneault had not properly been substituted for O'Brien as S.W.'s counsel.

O'Brien further objected to Vigneault appearing as counsel for S.W. because he was appearing "as the attorney for the guardian" and an attorney cannot appear both for the guardian and the person who faces commitment in a commitment hearing. Vigneault countered that he "was retained through the

---

[2] The thirty-two-page transcript of the virtual commitment hearing has approximately two hundred and eighty-six "indiscernible" notations. The audio recording of the hearing is also substantially inaudible. Many of the indiscernible passages are during the testimony of the State's expert witness. Because we are able to obtain sufficient information from the record to conclude that the November 18, 2020 commitment order must be vacated, we do not opine with respect to whether the condition of the transcript would otherwise require a new hearing.

party, [P.W.]," but represented S.W.[3]  The judge did not inquire into whether there was a conflict of interest as a result of Vigneault being retained by (and possibly representing) P.W., who supported S.W. being committed, and representing S.W., who opposed being committed.

S.W. also challenged P.W.'s claim to have been appointed her guardian. She stated on the record, "[P.W.] is not my guardian.  That's what this is all about . . . .  To clear all of this up.  She is not my guardian.  I don't have a guardian."  P.W. later testified she was appointed as S.W.'s guardian in May 2015 and remains her guardian.  S.W. again denied P.W. was her guardian: "I'm telling you that she is not my guardian and I have the documents to prove it."

Vigneault did not address S.W.'s contention that P.W. was not her guardian.  He produced no proof with respect to S.W.'s guardianship.  Nor did the trial court ask for any such proof.  As a result, the record contains no court order or other evidence establishing whether P.W. was S.W.'s guardian at the time of the hearing and, if so, the extent of her authority.  The court, however, appears to have accepted P.W.'s representation regarding her status as S.W.'s guardian and the scope of her authority as guardian.

---

[3]  It is not clear if Vigneault believed P.W. was a party to the commitment hearing.  She was not.

A-1044-20

The court noted that the temporary commitment order did not list an appointed attorney for S.W. and stated, "I don't know . . . Mr. O'Brien if your office has status." The following colloquy then took place:

> O'BRIEN: Well, Your Honor, (indiscernible) that I was served with papers. The presumption would be, if I was served with papers, that I'm counsel of record.
>
> THE COURT: Well, that's not the case (indiscernible) any order that you were served erroneously, so I'm sorry about that, as you are not specifically listed as the attorney. And as we know, (indiscernible) as part of the order, (indiscernible) the order of [the Law Division]. So I am denying your application to represent [S.W.] in this matter and indicate that Mr. Vigneault is representing her.

When the State called Dr. Ali as its first witness, the court asked O'Brien to remove himself from the virtual court hearing. O'Brien said he would like to remain on the hearing pursuant to N.J.S.A. 52:27EE-29 to -37, which he argued authorizes an attorney from the Public Defender's Office to participate in any civil commitment hearing. The court disagreed:

> Mr. O'Brien, I am going to deny your application, because the statute indicates that patients may not appear pro se and ha[ve] to be represented by counsel. Your office was not appointed as counsel. Counsel was obtained by the guardian of the patient, who – and I'm going to proceed with Mr. Vigneault. Over your objection, I'm going to order that you disconnect from this hearing, since you're not a party to this matter (indiscernible) counsel representing the patient and

A-1044-20

you're not (indiscernible). Your objection is noted for the record, so you can disconnect at this time.

At that point, S.W. said, "[e]xcuse me, [y]our [h]onor. I would like to represent myself." She continued, "[t]hey don't understand this case like I do . . . . Please let me speak . . . this is my life we're talking about." The court responded, "[y]ou'll have your chance after."

The court turned to the examination of Dr. Ali and asked Vigneault if he "want[ed] to voir dire the doctor as to his qualifications[.]" Vigneault replied that he did not.

Ali testified that S.W. lacked insight into her illness and opined she would not take her medications or be able to care for herself if discharged in her current condition. He stated that "[S.W.'s] judgment is impaired . . . , she is delusional and preoccupied with her grandiose delusions and paranoid delusions in this case, as well as every area of her life." Ali recommended S.W. be admitted for long-term psychiatric care.

During Ali's direct testimony, Vigneault made no objections. He thereafter declined to ask any questions on cross-examination. He did not question Ali regarding placement options for S.W. other than commitment to a psychiatric facility.

A-1044-20

P.W. was the second and final witness at the hearing. She testified that S.W. was admitted to the hospital several times since 2015 and described her as combative and medication non-compliant. When asked whether she was concerned about S.W. being in the community, P.W. replied "very much so[,]" but "my concern is not . . . is she a danger to herself. I'm concerned what someone would do to her." In response to the question "[d]oes she ever threaten you?" P.W. testified that "[S.W.] mostly tells me she's not crazy." She added, "I'm not going to say that I'm afraid of her. I'm not. I'm not afraid of her. It's just her mouth . . . ."

The following colloquy between the State's attorney and P.W. took place to conclude her testimony.

> Q: At this point, what are you -- are you concerned for her safety?
>
> A: Definitely.
>
> Q: What do you want for her?
>
> A: I would like to see her get long-term care that includes some type of psychosomatic therapy. I'm not a medical professional, so I would really need it explained to me all the things she needs, but she definitely can't live on her own. Living with me is very challenging, because I'm not an aggressive person and I'm not -- I can't keep an -- I can't (indiscernible) to work. And when she wanders, she can be

(indiscernible) . . . . She said she would rather live in the park or somewhere else other than – than with me.

. . . .

Q: So, the doctor is recommending that she continue treatment and is transferred. And you're in agreement with that as her guardian (indiscernible)?

A: Definitely.

On cross-examination, Vigneault asked P.W. only two questions: "Do you agree with Dr. Ali's assessment that there is no other option than for S.W. to have long-term care?" and "Do you believe it's in the best interests as the guardian – long term care?" She answered "yes" to both.

Vingeault presented no witnesses on behalf of S.W. He made no closing statement urging the court to deny the petition for commitment or to send S.W. to a less restrictive setting.

The court then ordered S.W. committed and that her commitment be reviewed in thirty days.

S.W. then addressed the court as follows: "Your Honor, didn't you say that you would let me speak?" She continued:

I am here to represent myself. What [P.W.] told you all is, in fact, a lie. And there [are] two sides to every story. And it seems to me like people who run right through me and I'm not going to hear or say anything.

9                                                                    A-1044-20

. . . .

> And I'm telling you that she is not my guardian and I have the documents to prove it.

The transcript of the exchange between the court and S.W. that followed is riddled with "(indiscernible)" notations. We gather, however, that the court did not allow S.W. to make any further statements or produce the evidence she claimed to possess regarding P.W.'s status as her guardian:

> THE COURT: (Indiscernible) –
>
> [S.W.]: Can I (indiscernible) –
>
> THE COURT: [S.W.]
>
> [S.W.]: – you [were] going to let me speak, but now you're not doing that. You're going (indiscernible) which is the game people play when they're on – when they're (indiscernible) a child. But I'm here to let you know –
>
> THE COURT: (Indiscernible) –
>
> [S.W.]: – that–
>
> THE COURT: – that (indiscernible) transfer you, if necessary, for long-term treatment, because University Hospital –
>
> [S.W.]: (Indiscernible) you're not going to let me speak (indiscernible) –
>
> THE COURT: – (Indiscernible) –

10

[S.W.]: Don't tell me to shut up. You don't (indiscernible) –

THE COURT: (Indiscernible) –

[S.W.]: – (indiscernible). Excuse me. That's why I ran out of the house, because she has (indiscernible). She has (indiscernible) and I'm not going to live (indiscernible) –

THE COURT: (Indiscernible) –

[S.W.]: Let me – don't you know (indiscernible) –

THE COURT: (Indiscernible) and that concludes this hearing.

Vingeault made no effort to intervene during this exchange on behalf of his client. He did not ask the court to allow him to question S.W. or to present the information she wished to convey to the court.

At that point, the proceedings devolved into what appeared to be a shouting match between S.W. and P.W. The transcript noted the two were "screaming over each other" and that S.W. told the court that P.W. was "stealing my Social Security money." S.W. also stated to the court that "[y]ou ain't showing no fairness to me by not letting me speak." Again, Vigneault took no steps on behalf of his client, who clearly wished to address the court and contest her commitment.

11

A-1044-20

On December 14, 2018, O'Brien asked the court for an Order and a statement of reasons explaining the basis for the trial court's substitution of Vigneault as S.W.'s counsel. The court declined O'Brien's request. The court instead sent O'Brien two email messages reiterating its view that the Public Defender's Office had not been appointed to represent S.W. and that P.W. had the authority to hire Vigneault as S.W.'s counsel.[4]

This appeal follows. S.W. raises the following arguments.

> POINT I
>
> MR. VIGNEAULT'S CONFLICT OF INTEREST REQUIRED HIS DISQUALIFICATION AS S.W.'S COUNSEL, AND THE TRIAL COURT ERRED WHEN IT DIRECTED HIM TO PROCEED AS HER COUNSEL OVER HER OBJECTION AND THE CONFLICT-OF-INTEREST OBJECTIONS OF HER PUBLIC DEFENDER.
>
> POINT II
>
> THE RECORD CONTAINS NO PROOF THAT S.W.'S SISTER IS HER APPOINTED GUARDIAN, AND THE COURT IMPROPERLY ALLOWED S.W.'S SISTER TO OVERRIDE HER CHOICE OF COUNSEL.

---

[4] We do not consider an email message from a judge to counsel to constitute findings of fact and conclusions of law pursuant to Rule 1:7-4.

POINT III

THE TRIAL COURT FAILED TO FOLLOW RULES ON THE WITHDRAWAL AND SUBSTITUTION OF COUNSEL WHEN IT DIRECTED MR. VIGNEAULT TO PROCEED AS S.W.'S COUNSEL.

POINT IV

THE STATE FAILED TO MEET THE REQUIREMENTS FOR INVOLUNTARY COMMITMENT BECAUSE IT FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT S.W. POSED A DANGER TO HERSELF OR OTHERS IN THE REASONABLE FUTURE.

II.

In order to involuntarily commit someone, the State must prove that:

> (1) the person is mentally ill . . . ; (2) the mental illness causes the person to be dangerous (a) to self or (b) to others or property . . . ; (3) the person is unwilling to be admitted to a facility for voluntary care; and (4) the patient needs care at a psychiatric facility or hospital because other available services will not meet the patient's needs.
>
> [In re Commitment of M.M., 384 N.J. Super. 313, 337 (App. Div. 2006) (citing N.J.S.A. 30:4-27.2(r), (h), (i) and (m)).]

To justify commitment, "it is necessary to show more than the potential for dangerous conduct." In re Commitment of J.R., 390 N.J. Super. 523, 530 (App. Div. 2007). "[T]he risk of dangerousness that will warrant involuntary

13                                                    A-1044-20

commitment must be relatively immediate: 'Commitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future.'" In re N.N., 146 N.J. 112, 130 (1996) (quoting State v. Krol, 68 N.J. 236, 260 (1975)). The "State must establish the grounds for commitment by clear and convincing evidence." In re S.L., 94 N.J. 128, 137 (1983).

"'The civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy.'" In re Commitment of T.J., 401 N.J. Super. 111, 119 (App. Div. 2008) (quoting S.L., 94 at 139). "[O]ur Legislature and the New Jersey Supreme Court have promulgated statutes and rules to ensure that no person is involuntarily committed to a psychiatric institution without having been afforded procedural and substantive due process." In re Commitment of Raymond S., 263 N.J. Super. 428, 431 (App. Div. 1993) (citing N.J.S.A. 30:4-27.1 to -27.23 and R. 4:74-7).

Our "[r]eview of a trial court's decision regarding a commitment hearing is extremely narrow." In re Civil Commitment of V.A., 357 N.J. Super. 55, 63 (App. Div. 2003) (citing State v. Fields, 77 N.J. 282, 311 (1978)). "[T]his court gives deference to civil commitment decisions and reverses only when there is

A-1044-20

clear error or mistake[.]"  M.M., 384 N.J. Super. at 334 (citing In re D.C., 146 N.J. 31, 58-59 (1996)).

"No person can be deprived of her right to govern and manage her own affairs – or her right to control the fate of her lawsuit – based on mental incapacity without rigorous adherence to the procedural protections set forth in our rules of court, statutes, and case law."  S.T. v. 1515 Broad St., LLC, 241 N.J. 257, 275 (2020) (citing R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35); R. 4:74-7(e).

The right to counsel is a crucial component of the due process protections afforded to someone facing involuntary commitment, which is "a significant deprivation of liberty . . . ."  Addington v. Texas, 441 U.S. 418, 425 (1979); Specht v. Patterson, 386 U.S. 605, 608 (1967); Pasqua v. Council, 186 N.J. 127, 148 (2006); S.L., 94 N.J. at 137.  Due process "guarantees the assignment of counsel to indigents in involuntary civil commitment proceedings."  Pasqua, 186 N.J. at 148.

The right to counsel in civil commitment proceedings is also guaranteed by statute.  A person facing involuntary commitment has "the right to be represented by an attorney, and if unrepresented or unable to afford an attorney, the right to be provided with an attorney paid for by the appropriate government

A-1044-20

agency." N.J.S.A. 30:4-27.11(c). In addition, a person facing involuntary commitment has the right to "have counsel present at the hearing" and the person cannot "appear at the hearing without counsel." N.J.S.A. 30:4-27.12(d).

A person's "right to control the direction of her case" cannot be deprived "[i]n the absence of a guardianship hearing and a judicial finding by clear and convincing evidence that [she] lacked the requisite mental capacity to decide how to proceed with her lawsuit . . . ." S.T., 241 N.J. at 262.

Here, P.W. claimed to have been appointed S.W.'s guardian and to have the authority to hire counsel on her behalf. S.W. disputed that argument, twice informing the court that P.W. was not her guardian. Although P.W.'s status as guardian was critical to resolve the question of which of the two attorneys purporting to represent S.W. would be permitted to proceed, the court did not ask P.W. or Vigneault for proof of P.W.'s status as guardian. The court also failed to make a finding that P.W. was S.W.'s guardian and that her authority included hiring counsel for S.W. against her wishes. These failures constituted clear error on the part of the trial court. In the absence of a finding, based on proof, that P.W. had been appointed guardian of S.W. with the authority to hire counsel for her, the trial court erred by allowing Vingeault to represent S.W.

We acknowledge that a person facing civil commitment may have a mental health condition that makes it difficult to accept a relative's appointment as guardian. In such circumstances, a claim that a guardian was not appointed may well be unfounded. However, where a question has been raised at a commitment hearing regarding the status of a person claiming to be a guardian, the trial court may not merely accept a claim of guardianship that is not supported by a court order. In addition, the court must make findings both with respect to the guardianship appointment and the scope of the guardian's authority.

In addition, having carefully reviewed the record, we conclude that Vigneault, even if appropriately hired by S.W.'s guardian, in effect did not provide S.W. with legal representation at the commitment hearing. The reason for this shortcoming may be attributable to Vingeault's divided loyalty between P.W., who hired him and supported S.W.'s commitment, and S.W., whom he purportedly represented and who opposed her commitment.

"A right to counsel is 'the right to the effective assistance of counsel.'" N.J. Div. of Child Prot. & Permanency v. G.S., 447 N.J. Super. 539, 555 (App. Div. 2016) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). "To be effective, counsel 'must provide the client with undivided loyalty and

representation that is untrammeled and unimpaired by conflicting interests.'" Id. at 556 (quoting State v. Norman, 151 N.J. 5, 23 (1997)) (internal quotations omitted). Counsel for an allegedly incapacitated person must determine "whether the alleged incapacitated person has expressed dispositional preferences and, if so, counsel shall argue for their inclusion in the judgment of the court." R. 4:86-4(b)(2)(v). An attorney must zealously advocate for his client. N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div. 2002). This is true "even when the lawyer believes that the client's desires are unwise or ill-considered." S.T., 241 N.J. at 275; Zigelheim v. Apollo, 128 N.J. 250, 261 (1992).

In the criminal context, our Supreme Court has "reinforced that it is incumbent on the courts to ensure that defendants receive conflict-free representation . . . ." State ex rel. S.G., 175 N.J. 132, 140 (2003) (citing State v. Loyal, 164 N.J. 418, 433 (2000)) (emphasizing trial court's responsibility for "assuring the fairness and reliability of the trial"). "'[A]n attorney hobbled by conflicting interests that so thoroughly impede his ability to exercise single-minded loyalty on behalf of the client cannot render the effective assistance guaranteed by our constitution.'" G.S., 447 N.J. Super. at 556 (alteration in original) (quoting State v. Cottle, 194 N.J. 449, 467 (2008)).

"[A]n attorney should not represent a client if there is a significant risk that the representation will be materially affected by some duty of loyalty or responsibility to himself or to a third person." State v. Lasane, 371 N.J. Super. 151, 161-62 (App. Div. 2004) (citing RPC 7.1(a)(2)).  The rule states, in pertinent part:

> (a)     Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> . . . .
>
> (2)     there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.
>
> [RPC 7.1(a)(2).]

"[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." Wheat v. U.S., 486 U.S. 153, 160 (1988).

P.W., who supported S.W.'s commitment, hired Vigneault.  The attorney's initial statement to the court was that he was appearing "for the guardian and the patient, [S.W.]"  Although he later clarified that he represented only S.W., the transcript clearly establishes that he made no effort to comply with S.W.'s

19

wishes to oppose commitment. Vigneault did not pose a single question to the State's expert on cross-examination. He did not explore with the expert the viability of placement options for S.W. other than commitment to a psychiatric facility. In addition, Vigneault asked P.W. only two questions on cross-examination, both seeking her agreement with the expert's recommendation that S.W. be civilly committed.

When S.W. disputed P.W.'s appointment as guardian, Vigneault did nothing to advance or explain S.W.'s argument. Vigneault remained silent as S.W. struggled to speak to the court at the end of the hearing, allowing her exchange with the court to devolve into a series of interruptions and ultimately, a shouting match with P.W. He failed to make a closing statement urging the court not to commit S.W. to a psychiatric facility.

Simply put, S.W. did not have an effective advocate at the commitment hearing. Vigneault, in effect, advanced only the interest of P.W., who wanted her sister to be civilly committed and who, presumably, was paying Vigneault's fee. The trial court failed to identify the conflict of interest facing Vigneault, a clear error, particularly in light of S.W.'s express rejection of Vigneault as her counsel and his ongoing failure to advocate on S.W.'s behalf.

A-1044-20

We do not question the sincerity of P.W.'s concern for her sister's safety and best interests. Nor do we have any basis to doubt P.W.'s belief that she is S.W.'s guardian with the authority to hire counsel on S.W.'s behalf. Fundamental concepts of due process, however, do not permit P.W., if she produces no proof that she is S.W.'s guardian, to retain counsel for S.W. who does not advocate on S.W.'s behalf at the civil commitment hearing. Nor can we abide counsel for a person facing civil commitment who makes no effort to assist his client in addressing the court or challenging the validity of a claim for guardianship.

We recognize that by their nature civil commitment proceedings may prove challenging for the trial court. We do not intend to suggest that trial courts do not have the authority to maintain control of civil commitment proceedings where a person facing commitment is obstreperous, seeks only to disrupt the hearing, or is unable to articulate a coherent argument opposing their commitment. However, we detect nothing of this nature in the record.

While S.W. may have serious mental health issues, she was able to articulate clearly her opposition to her commitment, as well as her claim that P.W. was not her guardian. Given that it was S.W. who was facing long-term deprivation of her liberty, she had a right to be heard. In the face of silence by

21

the attorney who purportedly represented S.W.'s interests, it was clear error for the trial court to conclude the commitment hearing without allowing S.W. to address the court.

In light of these errors, the November 18, 2020 commitment order is vacated. It has been several months since S.W. was civilly committed. The record does not contain evidence of S.W.'s current status or, if she remains committed, the date on which her commitment is scheduled next to be reviewed. We therefore stay our decision for fourteen days and remand to the trial court for a new commitment hearing consistent with this opinion before a different judge within that time if S.W. remains committed. We offer no opinion with respect to P.W.'s status as S.W.'s guardian or whether S.W. meets the criteria for civil commitment.

Because we conclude that the effective denial of counsel to S.W. at the commitment hearing invalidates the November 18, 2020 commitment order, we need not address S.W.'s remaining arguments.

Vacated and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22

A-1044-20